Thank you, your honor. May it please the court. Michael Berger for the appellants and cross respondents. We're we're here for one fundamental reason this morning or this afternoon now, and that is that the district court simply refused to apply California Civil Code Section 47. I have trouble with that litigation privilege. It looks like California's codification of the common law privilege, and it protects people against liability for defamation for what they say on the witness stand and also in the earlier stages of litigation, such as in depositions or answers to interrogatories. It seems to me that what the plaintiffs here want is to extend the litigation privilege to what they say in e-mails, to people that are not lawyers, not parties, not witnesses, just basically people that pay dues to their organization. And also to, I suppose, statements to the press. Are there California cases that extend the litigation privilege that much? Absolutely, Judge Kleinfelder. They are briefed in both of our briefs. I know you have cases that have quotes that seem to be broader than what I described, but no. The leading case in the California Supreme Court is the Silberg case. And what were the facts there? I wish I could remember the facts offhand. But the point of Silberg and of the other California cases that we've cited for you here is that the facts don't really matter. What matters is that the privilege in California Civil Code section 47 is absolute, and it applies not just to statements on a witness stand or in a deposition, but in any statements leading up to litigation, or in litigation, that are, as the Court put it in Silberg, not extraneous to the litigation. I wish I had the facts. I don't seem to have the case for some reason in my collection of authorities. And I'm wondering what sort of statements it said were privileged. For example, if I write a letter to somebody saying that somebody else committed a felony, say, and then a year later I sue, it might have been connected to the litigation, and then I hope the word got around and tainted the jury. But it was not anything necessitated by or a part of the litigation process. I'm glad you raised it that way, Your Honor, because it helps to explain the breadth and the limitations of California's litigation privilege here. Let me start with the illustration that you gave, which, in fact, is close to one of the cases which is discussed in both sides of Greece, the Nguyen case. I'm very bad on Vietnamese names, whether it's Nguyen or Nguyen or Nguyen. But in any event, that case was an unfair competition case. And in that case, the defendant made statements about the other party, the plaintiff, talking about his so-called criminal record, talked about him assaulting his wife, shooting at cars, things that obviously had nothing to do with unfair competition. And what was the context? Where were the statements made and when? They were made in the context of the litigation, but they had nothing to do with the litigation. Were they made in a deposition or testimony or answers to interrogatories or just a chat with a newspaper reporter or what? Again, I wish I had the detail for you. It seems to me that the way that the California courts have set up this rule, that the precise factual patterns are not relevant. That what is relevant is the absoluteness of this privilege. And in contrast to that case, our three cases at least from the court of appeals. The privilege is absolute. Okay, that makes it a profound privilege. Yes, it is. But how can you possibly say that? I've now heard you say it twice. The facts don't matter. Yes, sir. I've never heard of such a principle. Bizarre means I can tell any malicious lie I want as long as I subsequently sue the person. As long as what you have said has something to do with the litigation, that is the way that the California courts have interpreted it. But you're unable to give me a single California case where you can say the facts are like that as opposed to they're having some broad language. Unfortunately, I don't seem to have the relevant cases here. Well, the cases are all discussed in the briefs, Your Honor. Do you happen to remember the briefs in the cases? Sorry? Do you happen to remember the cases you cited in the briefs so you could answer my question? I can give this to you momentarily. I don't mean just the names. I mean some facts. Well, let me ask you about the Silbert case because I do have it. In that case, it appears that it was a dissolution case. Okay. And the parties had agreed that they would undergo a psychological evaluation and counseling and that the psychological evaluation and counseling would be conducted by independent psychologists, et cetera. But it appears that the husband had or the husband alleged that the wife had a relationship with a psychologist that had submitted the evaluation and sued for breach of contract, negligence, negligence, misrepresentation, et cetera. And I believe that the allegation was that the husband and the wife had made statements regarding this independence of the psychologist, which apparently were not true. So it seems to me that that's really, if you don't mind my interrupting, that's very, very different than the facts of this case. I mean, that was clearly connected and clearly made in the process of the litigation. All of the cases are factually different, Your Honor. There's no question about that. But the other important thing about Silberg is that in the process of reaching its conclusion, it dealt with several court of appeal opinions, which it seems to me are related to what the district court did in this case. The district court in this case was concerned that my clients had acted with malice and that they were, in fact, trying to hurt the plaintiffs and that that somehow deprived them of the ability to invoke Section 47's litigation privilege. What the Supreme Court did in Silberg was to take several California court of appeal decisions which had imported into Section 47 some sort of a good faith requirement before it could be invoked. Oh, I think you're absolutely right on this. It's an absolute privilege in the sense that it's not subject to an exception for knowingly false or reckless disregard of the truth, as long as it's in litigation. As long as it's in litigation or leading up to litigation? Well, leading up to is much broader than I think the cases go. And I'd like you to show me a case with facts where it's leading up to in the sense that you describe. As I understand the privilege, litigation doesn't immunize a statement that was made that would not be immune but for the fact that there was a subsequent lawsuit. I think the statements in this case are basically, if I understand it right, what you've got is two competing organizations that represent prison guards and oppose privatization, and each of them wants to tell their membership that the other are bad folks, and that that's what you want the litigation privilege to apply to. And I don't understand why it's in litigation. Why the dispute is in litigation? Except that in addition to telling all these bad things about each other, the parties also sued each other. They certainly did. Both sides, each side sued the other side. It was a situation where the defendants in this case believed that the plaintiffs in this case who were in essence the managing people of the organization Corrections USA had been mismanaging the organization. And the defendants were essentially the board people of that organization. Well, let me ask you this. Silberg says that the factors to consider are, one, was it made in judicial or quasi-judicial proceedings, two, by litigants, three, to achieve the objects of the litigation, and four, that have some connection or logical relation to the action. I had a problem with one of these. I believe it's the second, the e-mail sent by Mr. Jimenez. Can you tell me how does calling someone a thief and a liar, how does that somehow fit into any one of those factors set out by Silberg? I will have to agree with you that that is the lightest weight of the four. But it also is the one which to me has the least impact on anything, because if you look at that e-mail, unlike the other three, it was not broadcast. It was sent by one of the defendants to one of the plaintiffs, and it was copied to two other defendants and two other employees of the union. Is that not enough? I mean, that's a broadcast. It's a publication, right? It's not the kind of publication that it seems to me is covered by the defamation law. Publication and defamation means a third party. Yes. If I tell Judge Bybee something bad about you, that's publication for defamation law purposes. You may have mitigated your damages in some way, but it doesn't relieve you of defamation. It may not. But in this case, all of the people to that communication were parties to this litigation. They were all angry folks. Sorry? They were all angry folks. Yes, they were. And that's one of the things that clearly comes out in the records here, is that these are angry folks on both sides. What about the January 24, 2007 communication on the letterhead of CCPOA? When I read that, it strikes me as being more of a threat than anything else. And how exactly does that fit into the four factors elucidated in Silbert? Well, it seemed to me that that went like the rest of them. I don't see it as being terribly distinguishable, and I don't think the district court did either. The district court viewed these communications essentially as being the defendant's effort to retain its members and keep its members from defecting to new organizations being set up by the plaintiffs. And that is one of the key elements of this litigation, was to maintain that membership and to communicate to those members what was going on, what the plaintiffs were up to, and how the defendants were seeking to deal with that. Well, in attempting to preserve its membership, this had said, look, you're going to this new organization with these folks that have left our organization. Oh, by the way, they're all child molesters. I don't think it quite said it that clearly. I understand. Well, but I think that would make a difference. If it said, and by the way, they're all child molesters, I would have to agree that that's beyond the pale. Why? It would be perfectly okay if it was in a deposition. The absolute privilege would apply. Well, I guess we read the absolute privilege a little less absolutely in different senses. Your whole point was the facts don't matter, but the privilege was absolute. If it's absolute, you can indeed. No, no. It's absolute in the sense that there are four factors that are laid out there by the California courts, and one of them is that there has to be some relationship to the litigation. Sure. Don't believe a child molester. You know, if you can say don't believe him, I'll buy that. But it seems to me in that Winn case, the California courts said. Fired him because he's a child molester. Totally made up. I understand. That's why it's an absolute privilege. Well, but the absolute privilege doesn't apply, didn't apply in that other, in the Winn case, because the statement was made in a unfair competition case about somebody who molested his wife or shot at cars. Had nothing to do with anything. And the court said that's beyond Section 47. It's an absolute privilege as long as you fit into this matrix. But if you don't fit the matrix, then it's not absolute. It doesn't exist. But what we've got here are communications, all of which were made in the context of this angry dispute among people here. I don't know the way to sugarcoat it. This was an angry dispute between, among angry people. And all of these communications were done in that context. All of the communications were made to the membership of one of the organizations to inform the membership of what the litigation was, what it was about, at least what one side thought it was about, and in an effort to maintain the integrity of that organization. And it seems to me that if that's what was going on, and that's what it appears to me to be from the face of those documents, then that's covered by this absolute privilege because it is irrelevant to the litigation. So you can say anything you want to say about someone so long as you can find some connection to the litigation. So here, for example, saying that these gentlemen went out and bought a car with leather seats, et cetera, your position is that that's legally connected to the litigation because they were being accused of mismanagement, and that's part of the mismanagement. Exactly. And I think that that does fit in with the theory of mismanagement. What was the date of the first of the lawsuits against these people, Daw and the other fellow? Wasn't that counterclaimed in this case? Sorry. The date of the first. When was the lawsuit? When did the organization sue them? Hang on one moment, and I'll get that for you, Your Honor. I thought I had it here. I want to know two dates, actually. When did the organization sue them for their various alleged defalcations, and when did they sue the organization for the alleged defamations? There were multiple lawsuits. The first of the lawsuits was filed on September 29, 2006. That was a writ of mandate, right? That was a writ of mandate. A petition for a writ of mandate. That's right. And it was after that that this litigation was filed. And the application for a writ of mandate simply asked for records to be produced. That's correct. But it was not alleging that the plaintiffs in this case had been involved in any kind of ---- It did. It did, in fact, allege all of those things, and as part of the justification for demanding the records back. But if I may just augment this a little bit, Your Honor, going back to the idea that the litigation privilege applies when litigation is contemplated in good faith, by either side. In fact, in this case, by both sides. On August 2, 2006, defendants' counsel, that is my predecessor, wrote to the organization asking for the records. That's when things started, August 2, 2006. August 30, 2006, one of the plaintiffs emailed one of the defendants that he'd contacted an attorney, and he had been advised that he could sue the defendants for having been wrongfully discharged. At the September 7, 2006, CUSA board meeting, one of the plaintiffs said that he had a legal proceedings. On September 11, 2006, Daw's attorney sent a long letter to the California Attorney General, which Daw had written explaining his point of view of everything that had happened and apparently asking the Attorney General to take some action against the defendants. If I understand your interpretation of the privilege, what I could do in California is I could decide that I want to file a lawsuit against somebody. So a year before I file the lawsuit, I hire a public relations firm to generate a really big campaign, because I'm going for a lot of money, to try to get a whole lot of stuff in California papers and television and whatnot saying that the individual is a Nazi child molester. And then after I've created that tag to go with the person that I intend to sue, everybody thinks he's a Nazi child molester, and I can have said it totally falsely without any basis, knowing it was false. Then I sue him a year after I hire the PR firm to defame him, and everything that I did is immune under the California privilege. Only if the stuff that you were setting out was relevant to the lawsuit that you eventually filed. If it's not relevant, if it's not connected somehow, then it's not covered by the privilege. Rule 401 on relevance is real liberal. Well, it may be, but the cases that we've got here from California do explain where the lines are, to some extent at least. In the Nguyen case, it explains that if you go too far outside the bounds and you start accusing people of criminal conduct in a case that doesn't involve that criminal conduct, that's not protected by the litigation privilege. And I think that the propaganda campaign that Your Honor is positing here would fall within that side of the rule and not the absolute privilege. I'll make sure to get something about Nazi child molester into the complaint. You'd better make sure that you do. Otherwise, it wouldn't be covered by the privilege. Can I ask you a question? Absolutely. Assume that I decided that the, or we decided, that the message of September 30, 2006, and the message of January 3, 2007, were in fact protected by the privilege. That's a hypothetical, completely a hypothetical. So don't get any message from what I'm saying to you. Let's assume that to be true. What would be the effect? What would we then have to do? Would you say we have to send the whole case back for retrial, or what would be your position? My belief would be that Your Honors would have to send the case back for retrial. I was suspecting that was going to be your answer. But the question is, is there some sort of reason? If the jury never should have heard these things, then there's really no way to know what the jury relied on. The September 30 communication is from Mr. Baumann. Was there a – is there a separate judgment against Mr. Baumann for this – for this communication? There is a separate judgment against Mr. Baumann, yes. Okay. But if you were – if we thought the September 30, for example, was covered by the privilege, then presumably you could knock out the judgment against Baumann without affecting the rest of the judgment. That would be correct. I mean, all of this – the jury came back with a very detailed questionnaire on its verdict form, which is in the record. And it's very clear that, you know, they looked at all of this evidence, and clearly they did find against Baumann on some places. They found against Bayardi on some cases. They found against each of the two organizations in some cases. Can you address the issue of waiver of the statute of limitations? The statute of limitations, which deals with Mr. Harkins, it seems to me the only question that was raised below about it was whether it was properly included in the final pretrial order. And it was a question of whether the motion was properly included. The question here is whether or not there was a waiver of the statute of limitations, right? Whether it relates back. Well, I guess that's a different question, whether it relates back. And we briefed that as well. And it seems to me that you're dealing there with a claim against a different defendant at a different time, and that that different defendant's claim would not relate back to when he filed a claim against somebody else. It conceivably does that. Is there a case that says that, by the way? I'm sorry? Is there a case that says that? I believe we cited a case in the response. Can you tell me which one it is? Offhand, I can't recall which one it is. That's okay. All right. I'm interested in Waiver 2. This was kind of wild litigation in terms of how much there was in front of the district court. So it looks as though the district court needed the parties to tell the court before going to trial, what motions do I still have to rule on? Where does the record show that your side clearly told the judge that some or all of the claims that were made against your side were barred by limitations when the judge asked that? Well, I know it's in our opening brief. Counsel, would you give me some help in finding? I didn't know you were going to ask me that question. You can't claim yourself for authority. I want to look at the excerpts. I'm not doing that. I'm looking in the brief for where the citation would be. That issue is discussed in the first brief starting on page 31. Just tell me where to look in the excerpts of the record. I'm looking for that. I'm imagining myself the judge. I've got a million motions here. I don't know what's still pending, what I haven't ruled on because I overlooked it. And so I want you to tell me. So that's what I'm looking for. Would it be in the first volume of the excerpts, tab 7A, page 111B, where the court is amending the pretrial order to include the motions in limine? And what is it exactly that you contend? Was the effect of that on the trial judge? Are you saying that you were telling the trial judge that the statute of limitations issue with respect to Harkins on this claim? And that the judge ruled on that? That the judge ruled that it's amending the pretrial order to include that defense. Okay. So the trial judge found that there was no waiver. So that it wasn't waived and it should have been dealt with. I looked in the page 111. I hadn't. It must have been a different 111. It was just a signature page by the judge on something. I had 111B. I couldn't carry them all, frankly. So, Your Honor, the reference I have is to tab 7A, page 111B. I don't suppose you have that right there. I actually might. Was there a Rule 50 motion made at the conclusion of the plaintiff's case regarding the statute of limitations issue? I don't recall if there was. Was there a post-trial motion made? Sorry? Was there a post-trial motion made to set aside or vacate the judgment on the grounds that the statute of limitations barred the claim? That I believe there was. Okay. And what did the trial judge say about that? The trial judge denied the motion. Does that tell you that the judge maybe thought that the trial judge who was involved in the drafting of the pretrial order maybe thought that the statute of limitations did not apply? He may, in fact, have thought that. Okay. What I'm suggesting to the Court is that the record doesn't support that, and that it is clearly part of it. I have, Judge Kleinfeld, item tab 7A in volume 1, page 111B is page 2 of an order which lists defenses that were raised. Okay. And this is the page that I'm referring to, 111B. I'm sorry, 111D as in dog is the signature page, B as in boy is the page that I'm referring to. Thanks. I'll dig it out. Your Honor, if the Court has further inquiry, I'd be happy to respond, but I'm a bit over my time, I believe. Thank you. Good afternoon, Your Honors. May it please the Court. My name is Dan Baxter, and I represent Brian Daw, Gary Harkins, and Flatiron Mountain. Everybody in this room agrees that if the litigation privilege under 47B applies, it's absolute. That ignores the elephant in the room, which is whether it applies. And Mr. Berger cannot have it both ways. He can't tell you on the one hand that the facts don't matter and then proceed to try to distinguish when on the facts. At best, for purposes of anything supporting their argument, there is a factual issue as to whether 47B applies. That being the case, you have to find clear error. It's not the de novo standard that Mr. Berger and his clients would posit. Clear error. Judge Kleinfeld, to answer your question about the Nguyen case, that involved an unfair competition demand letter that threatened litigation based on purported bad acts. The person who allegedly undertook those bad acts in the context of that letter was also accused of beating his wife, shooting at cars, and vandalizing things. So let's talk about the facts of that relative to this case. On the one hand, one thing that is perhaps a little bit more attenuated in that case, and thus helping CCPOA at all, is that you've got beating lives and shooting at things as opposed to an unfair competition thing. That's a huge chasm. On the other hand, supporting our proposition, those comments were at least made in the context of a letter that was specifically threatening litigation. But it all goes into the factual hopper. And that's the issue. That's what they have not acknowledged for the duration of this proceeding, is that they may have one view, I may have another view. But what's required of this panel in order to get the yes from their standpoint is to find clear error. And based on the factual matrix that we have here, I submit that you cannot do that. Here's one other factual issue that's brought to bear. Under 47B, one of the factual questions here is whether or not the communication sufficiently relates to any litigation that was going on. Again, that's a factual question. In their reply brief, they posit this situation as being a settled factual record, because nobody disagrees on the dates of the transmissions, and nobody disagrees on what the transmission said, and nobody disagrees on to whom they were sent. But there is a keen and abiding disagreement on whether or not those communications had a sufficient nexus to litigation. And that, as stated in the Action Department case, is a factual issue. Counsel, the 47 privilege is interpreted pretty broadly, though, isn't it? It is, Your Honor. So if in doubt, one should look towards finding that the communication is privileged. If it's a really close call, absolutely, you're right. And so if you have litigation between two parties, one of whom is alleging that the other one mismanaged corporate affairs and abused his or her position with the corporation, a letter to its members telling its members what the nature of the litigation is or why they think that, you know, your clients, I guess, were acting improperly, that would have a logical connection to the litigation, wouldn't it? Your Honor, under the way you framed it, I would say yes. But that's not the factual situation we're dealing with here. If you look at the communications at issue, frankly, they are not far removed. And I understand Judge Kleinfeld was perhaps taking an extreme example to make a point. But that gulf between what was going on relative to any actual or pending litigation and the contents of the communications. But it doesn't have to be actual or pending. It has to be. Or threatened. Or threatened. Or contemplated.  When I said pending, I meant threatened.  All right. So it's not that far removed from the Nazi child molester example. You can't take a left turn and say, you know what, we're giving you an update, this sort of milquetoast posthumous characterization that's been given it by the defendants, and then take a left turn into oblivion and say, oh, by the way, he's out spending money as his personal booze fund, he's partying it up, he's doing all these things. And, by the way, if you, our organization, deal with him in the future, forget about what's happened in the past, but in the future, you will be investigated by, quote, unquote, multiple state and federal organizations. Why don't you take Judge Benitez's hypothetical and talk specifically about the September 30th email. Okay. The September 30th email saw Joseph Baumann under he's got one bullet point that starts out by saying something to the effect of this is an update. And then he goes through a laundry list of things that have nothing to do with the petition for writ of mandamus that had been filed, and frankly, in a lot of ways, nothing to do with anything that eventuated in the litigation that was ultimately later filed by CCDMA. Something to do with it. I mean, we're asking for records. That's all we're doing in the mandamus. Well, why would he ask for records? Because we think the guy is stealing from us. That's not how that went down. That's not how that went down. The September 30th communication begins opening line. We have initiated legal action. Right. And then it goes into left field. There are a few of those isolated bullets that I think in good faith the defendants could say, you know what, this really and truly was related to the initiation of the legal action. But if you look at the totality of that document and those bullets, you'll find things that are not, just based on a common sense review, sufficiently related to any litigation. Well, the association has to justify to its members spending a lot of money suing its former executives, and the justification for spending the money on the suit is they've been stealing it blind. But that's not how they characterize any of this. Your Honor, if they had said something to the effect, it would be a closer call. Still, there would be, I think, a divorce between reality and what they're claiming. But if they had actually said in the document, we want to provide you with an update, and by the way, these actions that we're undertaking in the litigation pertain to X, Y, and Z, maybe it's a closer call. But here, there's not even an implication. But it has to be a logical connection. Absolutely. Not a literal connection. True. But I submit to you that the most fundamental point is that most of those things have no logical connection. So that being the case, it then becomes incumbent on the defendants to create some sort of literal connection. I don't really see the – let me ask you a different question. Yes. Tell me the – what communications are within one year of filing the defamation lawsuit? This goes – okay. This goes to the limitations issue. I don't believe any of the four written communications are within that year. There were oral communications that Mr. Daw testified to and Mr. Harkins confirmed that did come within the one-year period. I've got a problem with getting a huge verdict for defamation based on written communications that were more than a year before the lawsuit. I don't really understand why that's okay. Oh, I'm thinking of – I'm talking specifically about Gary Harkins. Are you? I just want to make sure I'm – I was talking – Help me sort it out. Okay. All right. My previous answer related to the one year was specific to Mr. Harkins. When I came on board, I was not the initial lawyer. When I came on board and amended Mr. Harkins' action to add the claim against CCPOA, none of the four written communications that we're dealing with would have been within that one-year period. So, therefore, all of those but for the waiver and the relation back and the additional communications, oral communications that took place, those would be out but for those things. As to DAW, all of the communications were within the one-year period. Let me ask you a question. Again, hypothetically, don't take any messages from this, but assume that we found that the September 30th communication was, in fact, protected by the litigation privilege. Okay. What effect would that have on – would we have to send it back to the trial court or was there a separate judgment against Mr. Bowman and we could just simply vacate that judgment or what's your view? Your Honor, yes, it would be to the extent you were doing it just with respect to that. There was a separate judgment against Mr. Bowman, but I think I agree with Mr. Berger that you probably wouldn't be able to render that clean of a ruling just getting rid of that claim as a general matter because it's my belief that the jury's award against all defendants was predicated on the totality of those communications, including the Bowman email. So we can't – we wouldn't just be able to say, Bowman's out, no further proceedings before the district court. Let me, if I may, address the Harkin's defense issue. And, Judge Benitez, I think you hit on it perfectly with Mr. Berger. Judge Carlton clearly found that there had been a waiver. You look at the fact that he denied their motion, post-trial motion. You look at the fact that when we all had our boots on the ground during the litigation, he denied their attempt to undo the waiver that had occurred. You're a district court judge. Who better than the district court judge to know what the meaning and confines of a pretrial order is? If you put it that way, I can answer that very quickly for you. The district judge. That's right. But that was a loaded question. Well, I tell me the – it feels real recently. I guess it's long ago. But I was a district judge, too. And my reaction to this, to the excerpts of record in this case, was this is overwhelming. I would really need a lot of help from the lawyers to tell me what's decided, what's pending, what's before me, when I have to decide it. It's a lot of what I used to use lawyers for when I was a judge. And I'm not really clear on exactly what was asserted, how it was waived, when it was waived. I saw this one part of the transcript where the judge says, what else is before me, and the lawyers for your adversaries say statute of limitations. Right. Yeah. So Mr. Berger references, so this is at that page 111B in the first excerpt of record. And at that instance, I think the language he's pointing to, it's on lines – let's see. No, you know, actually, I mean, again, this – I'm just not seeing it. So I'll just answer your question directly. What happened is – What I'm looking at here is this, okay, next point. Statute of limitations, affirmative defense to Harkin's defamation claim. Right. Looks like it's still alive then. No. In fact, that's simply his indication that we're now addressing the issue of whether it's been waived. Then he says defense does not – reading from my law clerk's memo to me, this defense does not appear in the points of law in the pretrial memo. Right. At this point, I'm a little bit lost. So the pretrial memo, it was a little hard for you to understand because it had some kind of incorporation by reference. I think what their argument is, is that they at some point asked for their list of motions in the lemonade to somehow be incorporated into the pretrial order as setting forth issues. The problem that Judge Carlton – and Judge Carlton permitted that. The problem that Judge Carlton had later on, and that I had later on, which is why I argued that they'd waived it, is that no place in the pretrial order, even though he gave them three opportunities to clearly set forth the disputed issues of fact and law, nowhere is there a clear indication that this issue is in there. And in fact, on their best day in the pretrial order that was ultimately issued, that references to motions in lemonade, the only description, it says something like, Motion No. 13, CCPOA defenses in the most general sense to Harkin's claim. That's all it says. So there's a – as a trial lawyer, there is a sanctity to me of being able to – or a comfort to be able to look to the pretrial order that's ultimately in place, to be able to look at that as the full measure of the playing field and prepare my case accordingly. And there was something in the reply brief that bothered me a lot. In our – in our second brief, which was our initial brief and the second brief on appeal, I mentioned that if we had been placed on seasonable notice that this – that they were – had not waived it, that this really was in the case, that I would have taken pains to develop more of a factual record at trial to focus on communications that came within that one-year period relative to Harkin's. In their reply brief, they came back and said, well, you – that's – that doesn't make any sense because you should always try to develop any and every evidence supporting your claim. That shows a lack of understanding of what it's like to be a trial lawyer. If you've got things that are 10 on the Richter scale and things that are 1 on the Richter scale, for purposes of brevity and conciseness in presenting a case to a jury, you're going to focus on the 10s. If I knew that I had to focus on the 1s in order to overcome the statute of limitations defense, I would have focused on the 1s. Because that wasn't in the order, I didn't get the chance to do that. Can I ask a question? Was there an objection on the grounds of relevance when – when testimony was being obtained during the trial regarding Mr. Harkin's claims on the basis they were relevant because the statute of limitations would bar? I do not at all. Plenty, Your Honor. Okay. If I may – I'm sorry. Does that mean that it doesn't exist or does it – does it mean that it did not happen or does it mean that you just don't remember? I am 95 percent sure that they never objected on that basis to questions being asked at trial. There's – there's part of my head that forecloses me from asking you to take it to the bank, but I'm fairly sure. Okay. Let me, if I may, touch on the cross appeal briefly. We spent a lot of time in the briefs discussing the nuts and bolts of the State Farm reprehensibility factors, of whether or not the analysis gets conducted on a claim by claim or defendant by defendant basis. And Judge Kleinfeld knows better than anybody in this room about what the analysis is that governs those items, having written the Baines and Planned Parenthood decisions. The general point that I'd like to make before I close here is that, with the benefit of all of that, defendants' discussion of the trial court's remitter, the jury's verdict, focuses way, way too much on the actual harm that was suffered by my clients, neglecting the fact that four of the five State Farm factors focus on the reprehensibility of the conduct, not the actual harm. The only one that talks about harm is number one, and that's the one that deals with physical harm, which we concede was not experienced here. The rest of them deal with the conduct. So the focus, and I really submit it's a myopic focus in their briefing on, well, you know, it wasn't hurt that much by this, and the judge, you know, that's not the right analysis. Breyer, I don't know. After State Farm and Exxon Valdez, it's kind of hard to beat a remittor punitive. I disagree. I mean, well, I agree that it's hard to beat. I disagree that we should be guided by that, because in this case, you know, we've talked a lot, the defendants talk a lot about civil rights cases, sort of putting those up as the uber standard. You know, this isn't a civil rights case. Baines was before those. Right. Right. And so what differentiates this case, our case, from Exxon Valdez and the civil rights cases is this is a concerted, affirmative effort to tear down my clients. It's got nothing to do with repeated denials of benefits or somebody took a wrong turn into an iceberg or anything like that. Gross negligence is the apex of intentional, repeated conduct. It is exactly the type of conduct that qualifies them for the repeat offender status that they would demur to. It's exactly that type of conduct. And when you think about how qualitatively different this case is from Exxon Valdez, from the civil rights cases in that regard, I think that this is a paradigmatic example of a case that really cries out for that upping rather than a lower. But even with the remittor, you still got plenty of punitives, didn't you? Say again? You still got punitives despite the remittor. I was just going to ask you, $5 million in punitives. That's quite a bit of punitive, isn't it? Well, actually, $5 million, Your Honor, is the total remitted verdict. So that includes both compensatory and punitives. Still, that means $3 million in punitives? Your Honor, I can't sit here and say that we're crying poor mouth. But what I can tell you is that under the standards that govern this case, I would submit that the remittor was error and it wasn't abuse of discretion. Okay. Thank you, Your Honors. Mr. Berger, we took you well over your time, but I will give you a minute to respond to anything that the Court absolutely needs to hear. Thank you, Your Honor. Your Honor, the facts are what they are. Counsel wants to talk about how the facts militate toward sending this case to the jury on the question of the litigation privilege. The facts are clean. I leave that to the Court. Everybody knows what happened, and it's clear on its face. You may like it. You may not like it. You may not like the things that my clients were saying about his clients. But the facts are clear, and this should have been decided as a matter of law, and it should have been found to be within the litigation privilege of Section 47 because that's what Section 47 was there for. If I'd been on the jury, frankly, I would have gone your way. But I have trouble seeing why that's not a jury question. Because the facts – there's no dispute about what the facts are, Your Honor. The facts are we know who said what. We know when they said it. We know to whom they said it. But if I read it most sympathetically to your adversaries, we propose to spend a whole lot of your dues money suing your former executive director and the people that worked with him. Our justification for suing them first to get the records and then all kinds of other stuff is we think they were stealing you blind. For example, one guy keeps falling off the wagon and putting his bar tab on his expense account. And another guy, he's writing – they're writing checks to each other and all these bad things. And if I read it most sympathetically to the other side, it all is an explanation, which they would owe to their membership, for why they're spending all this money on lawyers to file lawsuits. As I say, if I'd been on the jury, I might well have gone your way, but I'm not. And I – so the question for me is just why isn't it a jury question? Because there is no factual question that needs to be decided. Why isn't the factual question how closely these statements are tied to the litigation? Because they – because on their face, there is no question that they're tied to the litigation. They say that. This is not the positive situation of somebody talking about the Nazi past and child molestation. No, this is more like a lawyer. This is more like a lawyer who suggests to the board of directors, I think you ought to sue somebody. And some board members say, what do you contemplate for attorneys' fees? Oh, between $1 and $3 million. That's a lot of money. How do you justify suggesting that we file a lawsuit that's going to cost us between $1 and $3 million? Well, then the lawyer has to provide justification. It may well have gone down that way, Your Honor. I don't know. It wasn't there. I think it's equally logical, knowing the parties that we're dealing with, that the board decided they needed to say something to their membership, that the board, as this Court could see from the record, was quite angry. And they came up with those issues on their own, not because some lawyer told them to do it. I suspect that if a lawyer was instructing them on what to do. Oh, I was giving a hypothetical. You understand. If a lawyer told them what to do, it would have been a whole lot more keyed, as counsel would like to have it, into, well, the litigation is there because of this and the litigation is there because of that, rather than just laying out a bill of particulars, for want of a better term, of why it is that we're going after these people whom you have trusted and we have trusted for all these years, and we're suddenly discovering things about them that make them totally untrustworthy, and we need to do something about it, and we need you to know why we're doing something about it. But, you know, if I can interrupt for just a minute. Sure. Okay, let's assume that to be true with regards to what I call one in three of the communications. But that second communication is certainly troubling, and I know you said it was the lightest. Can you explain to me how calling someone a thief and a liar has any logical connection to the litigation purpose? Well, it was, reading it as broadly as I can, preparatory to suing that individual and his friends precisely because they were seen to be thieves and liars. And that, as I said, that communication was closely held in-house. It went to people who were directly involved in the litigation. And I think it was, in that broad realm, designed as a precursor to suing those people precisely on those bases. Okay. I don't know what else I can say about it. Thank you. That is what it is. If I can say one word about the cross-appeal, it was a discretionary call on the part of the district judge whether to reduce those punitive damage recoveries. I thought that the judge explained himself well. I can't disagree with it. We did not appeal from what he did on the punitives, other than to say that under Section 47, none of that should have been taken into account in this case at all. And if the court agrees with us on Section 47, then the punitives disappear along with the rest of the judgment. The question about whether harm to the plaintiffs is relevant on the question of reducing the punitive damages award, it certainly is relevant to the question of the defendant's due process rights, how much harm has there been inflicted, and to what extent do you punish these people. As we've shown you, the extent of the punitive judgments in these cases is staggering. And as to at least CUSA, even the compensatory judgment is probably enough to put them out of business. As to CCPOA, it seriously is crippling. And to say that it doesn't matter what kind of harm has been inflicted on the plaintiffs when you're figuring out what the punies ought to be, I think is a misreading of the law. So we would ask the Court to look at Section 47 with a serious eye toward what the California cases have said about it and how broadly they've interpreted it and reverse this judgment. Okay. We thank counsel for the argument. The case is ordered and submitted. And the Court stands in recess until tomorrow. Thank you.
judges: Benitez, Kleinfeld, Bybee